NOT FOR PUBLICATION                                    (Document No. 34)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
:
MAIRA MIDDLETON,                        :
:
                        Plaintiff,       :          Civil No. 12-0605 (RBK/JS)
:
            v.                           :          **OPINION**
:
:
CITY OF OCEAN CITY and                   :
STEVEN SCHAFFER,                         :
:
                        Defendants.      :
_____ :

**KUGLER**, United States District Judge:

In this case, plaintiff asserts claims under 42 U.S.C. § 1983 and the New Jersey Civil

Rights Act, charging Steven Schaffer and the City of Ocean City with violating rights protected

by the constitutions of the United States and the State of New Jersey.

Currently before the Court is Defendants' motion for summary judgment.  (Defs.' Mot.

for Summ. J., Doc. No. 34).  For the reasons stated herein, the Court finds that Plaintiff has failed

to offer evidence in support of her false arrest, false imprisonment, malicious prosecution, illegal

search, and due process claims against Defendant Schaffer that would create a genuine dispute of

material fact for trial, and she has failed to offer evidence in support of her claims against

Defendant City.  However, Plaintiff has offered sufficient evidence to create a genuine dispute of

material fact as to her excessive force claim against Defendant Schaffer.  Accordingly, the Court

will **GRANT IN PART** and **DENY IN PART** Defendants' motion.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff is the owner of Bayview Marina in Ocean City, New Jersey, a company that "'rents personal water crafts, i.e., jet skis, to the public as part of its business.'"  (Defs.' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶¶ 5-6, Doc. No. 34-6.)  One of Plaintiff's competitors is a company called "Wet and Wild," which also rents jet skis and is located near Bayview Marina.  (Id. ¶ 8.)

On August 7, 2010, "Wet and Wild" contacted the Ocean City Police Department (the "OCPD") complaining that someone trespassed on their property.  When the OCPD responded to the scene, they did not find anyone on "Wet and Wild's" property.  (Defs.' Mot. for Summ. J.,

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

The Court notes that in addition to the responsive statement of material facts provided for by Local Civil Rule 56.1(a), Plaintiff also filed what appears to be her own affirmative statement of undisputed material facts.  (See Doc. No. 42-5.)  The local rules provide for an opponent of summary judgment to file a responsive statement of material facts, which addresses each paragraph of the moving party's statement.  L. Civ. R. 56.1(a).  It also permits the party opposing the motion to "furnish a supplemental statement of disputed material facts."  Id.  Document "42-5" is neither.  The Local Rules do not contemplate a nonmoving party furnishing its own statement of undisputed material facts.  Further, Plaintiff's statement goes well beyond a statement of material facts and appears to be Plaintiff's attempt to frame the background of this case, and to advance legal arguments.  (See, e.g., Pl.'s SUMF ¶ 65 ("the only action taken by the Ocean City Police Department with respect to providing its officers with guidance on arrest procedures was merely requiring them to sign an Acknowledgment of Receipt Form for the policy.  However, merely acknowledging receipt of a policy in no way guarantees that an officer has in fact reviewed the same.").)  Aside from not being contemplated by the local civil rules, such a document is not necessary to defeat summary judgment, as Plaintiff must only show that some material fact is in dispute, and need not affirmatively prove her case at this point.  Accordingly, the Court will disregard this document in its entirety.  This decision is further bolstered by the fact that although Defendants filed objections in response to Plaintiff's document, their objections also advance improper arguments.  (See Defs.' Resp. to Pl.'s SUMF ¶ 39, Doc. No. 45-3 ("Denied that Officer Schaffer testified that he personally handcuffed Plaintiff.  Rather, his trial testimony must be taken in light of the fact that as the highest ranking Officer on the scene, he directed that Plaintiff be arrested, and therefore, the proper reading of the trial testimony is that Officer Schaffer had Plaintiff arrested through his subordinate, Officer Doto").)  Thus neither of these statements aid the Court in its resolution of the instant motion and the Court will decline to rely on them.  See L. Civ. R. 56.1 cmt. a ("[t]he purpose of . . . the . . . 56.1 statement is to narrow the issues before the District Court, to assist in identifying whether material facts are, or are not, in dispute in a summary judgment motion"); see also Everest Reinsur. Co. v. Int'l. Aerospace Ins., No. 11-5332, 2012 WL 3638702, at *7 n.3 (D.N.J. Aug. 22, 2012) (disregarding "legal conclusions" in statement).

Ex. D pts. I-II (Deposition of Steven Schaffer, dated Mar. 15, 2013 ("Schaffer Dep.") 34:5-34:8,

Doc. Nos. 35-1, 35-2).)

The next morning, on August 8, the owners of "Wet and Wild" contacted the OCPD

again claiming that there were "drain plugs" missing on the dock.  (Schaffer Dep. 34:9-34:12.)

Accordingly, the OCPD returned to "Wet and Wild" to follow up.  (Id.)

Defendant Schaffer, an employee of the OCPD since 2002, was a detective at the time of

the incident at "Wet and Wild."  (Id. 10:4-11:23).  He first learned of this incident on the

morning of August 8, 2010, when he read the report of Officer Buffalino who had responded to

"Wet and Wild's" call the night before.  (Id. at 35:1-35:24).  Based on his review of Officer

Buffalino's report, Defendant Schaffer learned that an eyewitness, Mary Coppolino, told Officer

Buffalino that she saw a kayak heading from "Wet and Wild" back to the Bayview Marina

around the time of the incident.  (Id. at 36:25-37:8).  After speaking with several other

eyewitness, Officer Buffalino went to Bayview Marina and identified Patrick Depuydt, Katie

Heller, Vincent DeSantis, Emily Heller, Les Berdell, and Paul Oakley as individuals who were

present when he arrived. (Id. 37:4-38:3).

That same morning, Defendant Schaffer spoke with Officer Fearnhead who had been

responsible for following up on the "Wet and Wild" incident the morning of August 8, and had

spoken with Christopher Magazzu, the owner of "Wet and Wild."  (See Pl.'s Opp'n Br., Ex D

(Incident Report Form Prepared by Officer Gheen ("Incident Report")) 4, Doc. No. 42-2.)

Defendant Schaffer then talked with Mr. Magazzu who informed him that he heard that someone

was seen paddling away from his dock the previous evening and that when he arrived to work

that morning, he noticed that drain plugs were missing from four of his jet skis.[2]  (Schaffer Dep. 36:18-36:23; 36:25-38:3; 39:25-40:10.)  Mr. Magazzu also informed Defendant Schaffer that Bayview Marina is "Wet and Wild's" competitor, and that he has had "problems in recent years with [Plaintiff's] family attempting to sabotage his business."  (Id. 43:21-44:6).

Later on August 8, Defendant Schaffer traveled to Bayview Marina with the intention of interviewing the individuals listed in Officer Buffalino's report.  (Id. 45:1-45:9).  He first spoke with Vincent DeSantis ("DeSantis") who told him that three individuals, Emily Heller ("Heller"), Ashley O'Brien ("O'Brien"), and Plaintiff, were out in a kayak the previous night.  (Id. 45:22-46:8).  Defendant Schaffer then called for police cars to separately transport O'Brien, Heller, and DeSantis to the OCPD.  (Id. 46:9-46:11, 47:12-47:13.)  While at the OCPD, O'Brien, Heller, and DeSantis had their cell phones confiscated, were kept apart, and were interviewed separately. (Id. 47:10-14.)

During DeSantis's interview, he informed Defendant Schaffer that there had been some people hanging out and drinking after closing down Bayview Marina the previous night.  (Defs.' Mot. for Summ. J., Ex. H (Statement of Vincent DeSantis ("DeSantis S.") 7:12-16, Doc. No. 35-7.)  He then stated that O'Brien, Heller, and Plaintiff kayaked for twenty-five (25) or thirty (30) minutes and came back to shore about forty (40) minutes before the police arrived.  (Id. 8:9-8:24). He also informed Defendant Schaffer of the tensions between Plaintiff and the owners of "Wet and Wild."  (Id. 12:5-13:8).

---

[2] It is unclear whether this conversation occurred in person at "Wet and Wild" or at the OCPD, or whether it occurred via phone.  (Defs.' Mot. for Summ. J., Ex. D pts. I-II (Deposition of Steven Schaffer, dated Mar. 15, 2013 ("Schaffer Dep.") 39:25-40:3, Doc. Nos. 35-1, 35-2).)

During Heller's interview, she told Defendant Schaffer that she, O'Brien, and Plaintiff kayaked the previous evening; Plaintiff had sat in the front of the kayak, Heller had sat in the middle, and Ashley was in the back.  (Defs.' Mot. for Summ. J., Ex. I (Statement of Emily Heller ("Heller S.")) 8:3-8:18, Doc. No. 35-8.)  According to Heller, after five or ten minutes of kayaking, Plaintiff unexpectedly steered the kayak over to the "Wet and Wild" dock and stopped next to the business's jet skis.  (Id. 8:14-10:18.)  Although it was dark and Heller could not directly see Plaintiff remove any plugs from "Wet and Wild's" jet skis, Heller told Defendant Schaffer that Plaintiff removed plugs from three or four jet skis, and that she subsequently saw the plugs in Plaintiff's possession in the front of the kayak.  (Id. 11:18-13:20.)  They then paddled back to Bayview Marina.  (Id. 13:21-13:24.)

O'Brien was also interviewed and provided a similar version of what had occurred the night of August 7.  Specifically, O'Brien told Defendant Schaffer that she, Heller, and Plaintiff kayaked over to the "Wet and Wild" dock.  (Defs.' Mot. for Summ. J., Ex. J (Statement of Ashley O'Brien ("O'Brien S.") 5:9-5:24, Doc. No. 35-9.)  While next to the dock, O'Brien said that Plaintiff told her to "feel this," and then showed her a drain plug from a jet ski.  (Id. 6:2-15.)  Plaintiff then told O'Brien that she was removing the drain plugs, and proceeded to pull at least three or four drain plugs from "Wet and Wild's" jet skis.  (Id. 6:2-7:11.)  O'Brien told Defendant Schaffer that she believed that Plaintiff eventually dropped the plugs in the bay.  (Id. 6:2-7:3.)

After speaking with O'Brien, Heller, and DeSantis, Defendant Schaffer called Mr. Magazzu and relayed the facts that he had gathered thus far.  (Schaffer Dep. 52:17-53:1.)  Mr. Magazzu then advised Defendant Schaffer that he would only like to press charges against

Plaintiff.  (Id. 53:3-54:6).  Defendant Schaffer then went to Bayview Marina for purposes of arresting Plaintiff.  (Id. 58:15-58:21; 59:1-59:9; 67:16-17.)

When he arrived at Bayview Marina, Defendant Schaffer informed Plaintiff that she would need to accompany him to the OCPD.  Plaintiff indicated she would do so, informed her employees to this effect, and proceeded to join Defendant Schaffer outside of her business while the two of them waited for a patrol car to arrive.  (Defs.' Mot. for Summ. J., Ex. B (Deposition of Maira Middleton, dated Apr. 11, 2013 ("Middleton Dep. April")) 38:7-39:2.)  Upon spotting the approaching patrol car, Defendant Schaffer abruptly grabbed Plaintiff's left arm, walked her over to the parked car, and slammed her purse on top of the car.  (Id. at 38:7-39:17.)  Continuing to tightly grip Plaintiff's left arm, Defendant Schaffer pulled Plaintiff's arms behind her, causing her to feel pain in her left arm.  (Id. at 39:22-40:4.)  While trying multiple times to close his cuffs on Plaintiff's wrists, Plaintiff felt pain in her arms and wrists, and told Defendant Schaffer "you're hurting me, you're hurting me."  (Id. at 41:5-41:19.)

Defendant Schaffer eventually closed the cuffs on Plaintiff's wrists, at which point she felt "a lot of pain" in her left shoulder, which she thought was caused by her muscles being stretched.  (Id. at 41:20-42:11).  He also searched Plaintiff, which entailed patting down the inner, outer, and front parts of her thighs.  (Id. at 42:22-43:12.)  Upon arriving at the OCPD, Plaintiff was escorted into an interview room, at which point she exercised her right to have an attorney present.  (Incident Report at 9.)  Defendant Schaffer then called Judge Russell to obtain a warrant and a no-contact order against Plaintiff.  In support of this application, Defendant Schaffer provided Judge Russell with the facts he had gathered concerning the August 7 incident and gave him a summary of the history between the "Wet and Wild" and Bayview Marina, i.e.,

6

that Plaintiff and Mr. Magazzu had a history of filing complaints against one another.. (Schaffer Dep. 55:16-58:12.)  Judge Russell authorized a no contact order, as well as an arrest warrant for Criminal Trespass, Theft, and Criminal Mischief, disorderly persons offenses under New Jersey law.  (Incident Report at 5, 9).

At a later date, Plaintiff sought out medical care for the injuries she believed she sustained during her arrest.  She was seen by Dr. Paulvin and complained of numbness on the upper left side of her back.  (Middleton Dep. 34:19-35:7.)  X-Rays were taken of Plaintiff's back and hip, but she received no further treatment from Dr. Paulvin or any other physician.  (Id. 36:5-36:23.)  Plaintiff testified that although her numbness has generally subsided, it comes back in humid weather or if she has "been very active."  (Id. 36:24-37:11.)

Plaintiff's criminal case was eventually tried on December 28, 2010, in the Borough of Avalon Municipal Court before The Honorable George B. Neidig.  (Defs.' Mot. for Summ. J., Ex. T (Opinion of Judge George Neidig, Jr., dated July 22, 2011 ("Neidig Opinion")) 1, 12.) Defendant Schaffer and Plaintiff both testified.  (Id. at 6, 8-12.)  On July 22, 2011, Judge Neidig issued his Opinion in which he stated that he was not convinced beyond a reasonable doubt that Plaintiff was guilty of any of the three charges and, accordingly, found Plaintiff not guilty of all three charges.  (Id. at 12.)

On February 1, 2012, Plaintiff filed suit against Defendants.  (Compl. ¶ 1)  Defendants filed the instant motion for summary judgment on September 28, 2013.  (Doc. No. 34).  As this motion has been fully briefed, the Court will now turn to the parties' arguments.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v.

8

Varner, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder, not the district court.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    DISCUSSION

Plaintiff alleges violations of the federal Constitution under 42 U.S.C. § 1983, as well as the New Jersey Constitution under the New Jersey Civil Rights Act (the "NJCRA").  As the allegations under the separate constitutions are virtually identical, and federal and New Jersey law governing these violations are substantially similar, the Court will address them together. See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000).[3]

---

[3] Although the parties also argue as to the merits of Plaintiff's "state law claims," no such claims exist aside from her claims premised on the New Jersey Constitution actionable pursuant to the New Jersey Civil Rights Act.  (See Compl. ("This is an action for money damages brought pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, the New Jersey State Constitution and New Jersey Civil Rights Act").)

A.        **Plaintiff's Claims Against Defendant Schaffer**

Plaintiff brings claims for false arrest and false imprisonment, illegal search, malicious prosecution, and excessive force.[4]  With respect to these claims, Defendant Schaffer contends that he is entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Ray v. Twp. of Warren, 626 F.3d 170,

---

[4] The Court also notes that not only does it appear that Plaintiff abandoned some of her claims, there is some confusion as to how the New Jersey State Constitution and New Jersey Civil Rights Act applies to certain of her other claims.  Illustratively, in her Complaint, Plaintiff seeks relief for a violation of her due process rights under the Fourteenth Amendment.  She also alleges that Defendant Schaffer violated her rights pursuant to N.J. Const. art. I ¶ 1 by "unlawfully arresting her and maliciously prosecuting her."  (Compl. ¶ 27.)  While the New Jersey Constitution does not explicitly enumerate a right to due process, N.J. Const. art. I ¶ 1 provides:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

Id.  Accordingly, courts have held that "to assert a violation of substantive due process under the New Jersey Constitution, a plaintiff must show that the particular right is fundamental."  Rotante v. Franklin Lakes Bd. of Educ., No. 13-3380, 2014 WL 1266238, at *9 (D.N.J. Mar. 26, 2014) (citing Lewis v. Harris, 908 A.2d 196 (2006)).  Here, Plaintiff fails to offer any evidence in support of a due process claim, under either Constitution, nor does she respond to Defendants' motion on this ground.  Accordingly, Plaintiff's due process claims will be dismissed.

As to Plaintiff's specific allegation that her arrest was unlawful and she was maliciously prosecuted under the New Jersey Constitution due to a lack of probable cause, allegations of constitutional violations premised on a lack of probable cause are more properly analyzed under N.J. Const. art. I ¶ 7, the Fourth Amendment's analog.  See Lucia v. Carroll, No. 12-3787, 2014 WL 1767527, at *3-5 (D.N.J. May 2, 2014) (granting summary judgment in defendant officer's favor on Fourth Amendment false arrest claim and corresponding malicious prosecution claim on the grounds that officer had probable cause to arrest and holding that because the analysis for plaintiff's corresponding claims under N.J. Const. art. I ¶ 7 and NJCRA would be the same, the officer was entitled to summary judgment on those claims as well).

Here, however, Plaintiff does not allege that Defendant Schaffer actually violated N.J. Const. art. I ¶ 7.  See Celestine v. Foley, No. 10-1775, 2010 WL 5186145, at *6 (D.N.J. Dec. 14, 2010) ("In his Complaint, Plaintiff failed to identify which specific New Jersey State constitutional provisions Defendants allegedly violated. The Court will, therefore, dismiss Plaintiff's claims arising under NJCRA").  Regardless, as discussed in Part III infra, federal and New Jersey law governing Plaintiff's alleged constitutional violations are substantially similar.  As the Court holds that Plaintiff's false arrest, false imprisonment, malicious prosecution, and illegal search claims fail under the United States Constitution, they would similarly fail under article I paragraph 7 of the New Jersey Constitution.

173 (3d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223 (2009)).  If a reasonable officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate.  Id. "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  Id.  "The immunities of municipalities and their officials sued directly under [the New Jersey Constitution] are identical to those provided by federal law."  Lloyd v. Borough of Stone Harbor, 432 A.2d 572, 583 (N.J. Super. Ct. Ch. Div. 1981); see also Ramos v. Flowers, 56 A.3d 869, 882 (N.J. Super. Ct. App. Div. 2012) ("qualified immunity is an affirmative defense under the [NJCRA]"); J.S. v. Lee, No. L–783–10, 2011 WL 1344997, at *3 (N.J. Super. Ct. App. Div. Apr.11, 2011) (applying the federal qualified immunity standard to address both federal section 1983 claims and state constitution claims under NJCRA).

The Supreme Court has established a two-part analysis to determine if qualified immunity is appropriate:  (1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  Pearson, 555 U.S. at 232.  Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.  Id. at 236.  The right is "clearly established" only if the right was sufficiently clear such that a reasonable official would understand that what he is doing violates that right.  Ray, 626 F.3d at 174.  Even if the officer made a mistake about the legal constraints on his actions, as long as the mistake was reasonable, qualified immunity still applies.  Id.  To avoid hindsight, the officer's actions is judged from the perspective of a reasonable officer under the circumstances.  Id.

11

In each of the claims below, the Court will determine whether qualified immunity applies to Defendant Schaffer.

    1.  <u>Malicious Prosecution</u>

"To prove malicious prosecution under [section] 1983, a plaintiff must show that (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." <u>Kossler v. Crisanti</u>, 564 F.3d 181, 186 (3d Cir. 2009). New Jersey courts apply virtually the same standard under state law. <u>LoBiondo v. Schwartz</u>, 970 A.2d 1007, 1023 (N.J. 2009) ("Malicious prosecution requires the plaintiff to prove four elements: (1) a criminal action was instituted by this defendant against this plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; and (4) the action was terminated favorably to the plaintiff."). Under both standards, plaintiffs must satisfy each of the elements. <u>Id.</u>; <u>Kossler</u>, 564 F.3d at 186.

Plaintiff argues that the criminal proceeding against her was initiated without probable cause and that Defendant Schaffer acted maliciously or for a purpose other than bringing Plaintiff to justice. (Pl.'s Opp'n Br. 9.) In support of these arguments, she contends that Defendant Schaffer failed to, <u>inter alia</u>, properly investigate the scene of the incident, interview certain individuals listed in Officer Buffalino's report who were noted as being present at the Bayview Marina the night of the incident, and inform Judge Russell at the time of his application that there was evidence that the trespasser at "Wet and Wild" was a male. (Pl.'s Opp'n Br. 6-7.)

12

Plaintiff also states that Heller and O'Brien's statements were suspect and inconsistent on several critical points. (Pl.'s Opp'n Br. 5 (citing O'Brien S. 13:8-14:14).) Because of these facts, Defendant Schaffer lacked probable cause to arrest Plaintiff, and this lack of probable cause supports that inference that he acted with malice.

The Court is not persuaded by Plaintiff's arguments.

As detailed in Part I supra, Heller and O'Brien gave detailed statements to Defendant Schaffer concerning the August 7 incident at "Wet and Wild." Both women confirmed that they had been with Plaintiff that night, and that the three of them took a kayak out and "ended up" at "Wet and Wild."

Heller stated that after the three women arrived at "Wet and Wild," Plaintiff exited the kayak and approached the jet skis. Although Heller stated that "[i]t was pretty dark" and she could not "really see what [Plaintiff was doing," (Heller S. 12:3-13), she also stated that she believed Plaintiff removed approximately four drain plugs from the jet skis and that she later observed that the "screws" were in the kayak and that she "guess[ed]" that Plaintiff "took them," but that she was "not sure what [Plaintiff] did with them." (Id. 12:14-13: 17.) Once they returned to Bayview Marina, Heller observed that the police had arrived, but she did not want to "rat" Plaintiff out. (Id. 15:2-6.) When Defendant Schaffer arrived at Bayview Marina the next day, August 8, Plaintiff told Heller to say that Heller had been hanging out in the garage the night before. (Id. 17:4-18.)

O'Brien corroborated Heller's statement. She stated that once they arrived at "Wet and Wild," Plaintiff grabbed the "floating dock" and pulled them over. (O'Brien S. 5:17-24.) O'Brien then observed Plaintiff "playing with something," and asked "what are you doing?"

13

(<u>Id.</u>)  In response, Plaintiff said "feel this," at which point O'Brien went over to look, asked what Plaintiff was referring to, and Plaintiff stated "it's a drain plug, I'm taking them out."  (<u>Id.</u> 6:1-9.) O'Brien told Defendant Schaffer that although she knew that what was going on was wrong, Plaintiff was their boss.  (<u>Id.</u> 6:12-15.)  O'Brien then stated that after they left "Wet and Wild," Plaintiff "had . . . the plugs in her lap and she put them in the bay.  I think that's what she did with them.  I think there was still some left in the kayak.  So she put them in the bay."  (<u>Id.</u> 6:20-7:3.)  According to O'Brien, Plaintiff pulled at least three or four of the plugs from the jet skis. (<u>Id.</u> 7:8-11.)  After they returned to Bayview Marina and returned the kayak, O'Brien stated that she left to go to a friend's house and saw the police at "Wet and Wild."  (<u>Id.</u> 8:1-15.)  O'Brien later stated that she did not want Plaintiff to get in trouble, but that she knew what she did was wrong.  (<u>Id.</u> 10:1-3.)

These statements are consistent and sufficient to support Defendant Schaffer's conclusion that probable cause existed to arrest Plaintiff:  he received two separate eyewitness reports from credible individuals that had been on the scene—and in Plaintiff's company—at the time of the incident.  <u>See</u> <u>Merkle v. Upper Dublin Sch. Dist.</u>, 211 F.3d 782, 790 & n.8 (3d Cir. 2000) (noting that although the plaintiff argued probable cause was lacking because officer "failed to interview other witnesses . . . prior to making the arrest," officer "had every reason to believe a credible report from [an individual] who witnessed the alleged crime[, and] [t]his report alone sufficiently established probable cause").

Further, although Plaintiff is not satisfied with how Defendant Schaffer conducted his investigation, and takes issue with the fact that he did not inform Judge Russell at the time of his application for a warrant that there was evidence that the trespasser at "Wet and Wild" was a

male, the law does not require an arresting officer who already has incriminating information "in hand" to "conduct a further investigation or put contradictory evidence into the affidavit." Gramenos v. Jewel Cos. Inc., 797 F.2d 432, 440 (7th Cir. 1986); see also Davis v. Malitzki, 451 F. App'x 228, 233 (3d Cir. 2011) (a "credible report from a credible witness" can suffice and evidence that might exonerate a defendant does not defeat probable cause); Jocks v. Tavernier, 316 F.3d 128, 135-36 (2d Cir. 2003) (holding that probable cause does not turn on evidence that might exonerate because there is no "duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested"); Merkle, 211 F.3d at 790 (an officer is "not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already exist[s]").

As Defendant Schaffer had probable cause to arrest Plaintiff, Plaintiff's argument that he acted with malice based on a lack of probable cause fails.

As such, Plaintiff has failed to raise a genuine issue of material fact that Defendant Schaffer lacked probable cause to arrest Plaintiff or that he acted maliciously or for a purpose other than bringing the Plaintiff to justice. Accordingly, she has failed to establish all the elements of malicious prosecution under both federal and New Jersey law, and thus Defendant Schaffer is entitled to qualified immunity on this claim.

2.  False Arrest and False Imprisonment

Plaintiff alleges that she was falsely arrested and imprisoned by Defendant Schaffer and advances two arguments in support of these claims: (1) Defendant Schaffer lacked probable cause to arrest her; and (2) Plaintiff's arrest violated the OCPD's policy on Arrest, Search, and Processing Procedures, which requires that an officer may only arrest a person for a disorderly

persons offense when that offense is committed in his presence.[5]  (Pl.'s Opp'n Br. 7-8 (citing Ex.

M (Ocean City Police Department Arrest, Search, and Processing Procedures (the "OCPD

Operating Procedures")) § IV(A)(1)-(3), Doc. No. 42-4.)

     Similar to a claim for malicious prosecution, a false arrest claim is predicated upon a lack

of probable cause.  Couden v. Duffy, 446 F.3d 483, 494 (3d Cir. 2006); Connor v. Powell, 744

A.2d 1158, 1164 (N.J. 2000).  In the absence of probable cause, the "arrestee has a claim under §

1983 for false imprisonment based on a detention pursuant to that arrest."  Groman v. Township

of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995) (internal citation omitted).

     As stated above, there was sufficient probable cause for Defendant Schaffer to believe

that Plaintiff was involved in the theft of the drain plugs such that Plaintiff's claims fail on this

ground.

     As to Plaintiff's arguments premised on the OCPD Operating Procedures, the Court finds

that these arguments are similarly without merit.

     Although Plaintiff's arrest may have been in violation of the OCPD Operating

Procedures, it does not follow that her arrest violated the Fourth Amendment.  See United States

v. Laville, 480 F.3d 187, 192 (3d Cir. 2007) ("we made it quite clear that the validity of an arrest

under state law must never be confused or conflated with the Fourth Amendment concept of

reasonableness, and that the validity of an arrest under state law is at most a factor that a court

may consider in assessing the broader question of probable cause").  Further, the Court is

---

[5] Plaintiff adds in a footnote that "Defendants cannot dispute that Plaintiff was falsely imprisoned inasmuch as she was seized, handcuffed, detained and ultimately incarcerated."  (Pl.'s Opp'n Br. 8 n.1.)  Because the Court already concluded, however, that Defendant Schaffer had probable cause for Plaintiff's arrest, her false imprisonment claim necessarily fails.

unaware of any controlling precedent that establishes that Plaintiff had a right, <u>under the Fourth Amendment or its New Jersey counterpart</u>, to be free from an arrest for disorderly persons offenses that were not committed in Defendant Schaffer's presence, but which were supported by probable cause.  <u>See</u> <u>Virginia v. Moore</u>, 553 U.S. 164, 177-78 (2008) (stating that "the arrest rules that the officers violated were those of state law alone, and as we have just concluded, it is not the province of the Fourth Amendment to enforce state law").

Accordingly, because the Court concludes that the right on which Plaintiff bases her false arrest and false imprisonment claims was not "clearly established" at the time of Plaintiff's arrest, Defendant Schaffer is entitled to qualified immunity based on the second step of the qualified immunity analysis.  <u>See</u> <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 341 n.11 (2001) (citing <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 756 (1984) (White, J., dissenting) ("[T]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment")) ("we need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests"); <u>see also</u> <u>Hedges v. Musco</u>, 204 F.3d 109, 121 (3d Cir. 2000) (granting defendants' motion for summary judgment on plaintiffs' claims under Article I, paragraph 7 of the New Jersey Constitution, because it was already established that there was no federal constitutional violation) (citing <u>Desilets v. Clearview Regional Bd. of Educ.</u>, 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) (stating that the court was "not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart")).[6]

---

[6] <u>See also</u> <u>Rodriguez v. City of Passaic</u>, 730 F. Supp. 1314, 1319 (D.N.J. 1990), <u>aff'd</u>, 914 F.2d 244 (3d Cir. 1990) ("Art. 1, ¶ 7 of the New Jersey Constitution virtually replicates the Fourth Amendment to the United States Constitution and decision under the latter will be dispositive of the former.").

3.  Illegal Search

Plaintiff next claims that Defendant Schaffer violated her constitutional rights by searching her after an arrest that he executed without probable cause for offenses that had not been committed in his presence.

It is well settled that "officers may perform searches incident to constitutionally permissible arrests in order to ensure their safety and safeguard evidence."  Virginia v. Moore, 553 U.S. 164, 176-77 (2008) (citing United States v. Robinson, 414 U.S. 218 (1973)).  In Moore, the Supreme Court described this rule "as covering any 'lawful arrest,' with constitutional law as the reference point," i.e., the Supreme Court "equated a lawful arrest with an arrest based on probable cause:  'A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; *that intrusion being lawful,* a search incident to the arrest requires no additional justification.'"  Id. (emphasis in original).  Here, as Plaintiff's arrest was supported by probable cause, she cannot sustain a claim for an illegal search.  See Perez v. City of New York, No. 07-10319, 2009 WL 1616374, at *6 (S.D.N.Y. June 8, 2009) ("As the court has already reasoned that probable cause existed for the plaintiff's arrest, granting the defendants' motion for summary judgment, as it relates to the plaintiff's unlawful search claim, appears warranted, since the search was incident to an arrest based upon probable cause").[7]

---

[7] In Plaintiff's opposition to Defendants' motion for summary judgment, she takes issue with the fact that Defendant Schaffer "searched Plaintiff's person, beginning at her inner thighs, then moving to her outer thighs, the front of her thighs, and her back before proceeding upwards."  (Pl.'s Opp'n Br. 15.)  To the extent Plaintiff takes issue with the manner in which the search was conducted, she does not appear to raise a cause of action based on this allegation in her Complaint.  In any event, even considering the merits of this claim, no genuine issue of material fact is presented because Plaintiff points to no evidence which would lead a reasonable factfinder to conclude that Plaintiff was touched in an inappropriate way such that Defendant Schaffer's actions ran afoul of the Fourth Amendment.  See Garcia v. Aguiar, 138 F.Supp.2d 298, 303-304 (N.D.N.Y. 2001) (search of the plaintiff was reasonable and did not violate the Fourth Amendment when the plaintiff's "own deposition testimony reveal[ed] that [the police officer]

Accordingly, Defendant Schaffer is entitled to qualified immunity on this claim.

4. Excessive Force

Plaintiff also alleges a claim for excessive force in violation of her Fourth Amendment rights based on Defendant's Schaffer's conduct during the course of her arrest.

Claims that police officers used excessive force in an arrest are analyzed under the Fourth Amendment objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 388 (1989). To state a claim for excessive force under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable. Curley v. Klem, 499 F.3d 199, 203 (3d Cir. 2007). The test of Fourth Amendment reasonableness of force used during seizure is whether, under the totality of the circumstances, an officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivations. Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397. An excessive force claim must be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004); Lamont v. New Jersey, No. 09-1845, 2011 WL 753856, at *5 (3d Cir. Mar. 4, 2011) ("Monday morning quarterbacking is not allowed").

In assessing whether the use of force was objectively reasonable, courts consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Courts may also

---

conducted a pat frisk that consisted of patting down one leg, moving up [the plaintiff's] leg across her crotch and down the other leg, placing the side of his little finger down the middle of her breasts, checking under each breast, and then patting [the] [p]laintiff's rear pants pockets.").

consider "the possibility that the persons subject to the police action are violent or dangerous, . . . the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004).

While reasonableness is often a question for the jury, summary judgment in favor of defendants is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Id. (quoting Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999)).

New Jersey courts apply the federal standard when addressing excessive force claims brought under the state constitution. See State v. Ravotto, 777 A.2d 301, 306-307 (N.J. 2001) (applying the federal standard for both the federal and state constitutional claims); see also Watters v. Emery, No. L-19-05, 2008 WL 1820700, at * 3-4 (N.J. Super. Ct. App. Div. Apr. 24, 2008) (same); Norcross v. Town of Hammonton, No. 04-2536, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008) (finding that the excessive force standard under the New Jersey constitution is the same as under the federal constitution).

Here, Defendant Schaffer's actions in trying to handcuff Plaintiff may support an excessive force claim.[8]  The record shows that when Defendant Schaffer returned to Bayview Marina he approached Plaintiff and asked her to "come outside and talk to [him]." (Schaffer Dep. 67:16-68:10.)  He told her that he was investigating the incident at "Wet and Wild" and "had reason to believe that [Plaintiff] was directly involved and that she[] [was] the one that did

---

[8] There is some contradiction in the record as to who was responsible for handcuffing Plaintiff.  Although Plaintiff testified that Defendant Schaffer was responsible for handcuffing her and causing her pain, Defendant Schaffer testified that Officer Doto was actually responsible for putting handcuffs on Plaintiff.  (See Schaffer Dep. 69:20-22 ("A. I didn't put the handcuffs on Mrs. Middleton.  Q. . . . Who did? A. Officer Doto.").)  Necessarily, this is an issue properly left to the jury.

it." (Id. 68:8-10.) He then called for a patrol car to transport Plaintiff to the OCPD. (Id.)

Plaintiff testified that she followed Defendant Schaffer outside and, after informing her

employees that she needed to step out, (Middleton April Dep. 38:9-24), "grabbed her purse and [

] went back out and stood outside of the business with Defendant Schaffer," (id. 38:23-39:2.)

     Shortly thereafter, a patrol car drove up in front of Bayview Marina. According to

Plaintiff, as the patrol car arrived, Schaffer grabbed her left arm very tightly, walked her over to

the vehicle, grabbed her purse and slammed it up on the car, and immediately pulled her arms

back behind her. (Id. 39:8-17.) She testified that the way Defendant Schaffer was grabbing her

left arm caused her pain, (id. 40:14-41:2), and that she started experiencing more pain as

Defendant Schaffer proceeded to handcuff her because the handcuffs "weren't clicking," (id.

41:5-8.)

     According to Plaintiff, Defendant Schaffer was "forcefully trying to get the handcuffs on

while she continued to tell him that he was hurting her because he was pulling on her wrists and

arms. (Id. 41:5-19.) Plaintiff further testified that she experienced a lot of pain during the course

of her arrest, particularly in her left shoulder. (Id. 41:20-42:11.) Even though Plaintiff continued

to plead with Defendant Schaffer to stop because he was "really, really hurting [her]," Defendant

Schaffer responded: "I can't stop, you're under arrest." (Pl.'s Opp'n Br., Ex. G (Deposition of

Maira Middleton, dated Jan. 16, 2013 ("Middleton Jan. Dep.")) 56:6-9, Doc. No. 42-3.)[9]

---

[9] Defendant Schaffer claims that Officer Doto handcuffed Plaintiff and that she did not complain about being in pain while being handcuffed. (Schaffer Dep. 69:20-69:25.) However, Defendant Schaffer also testified during Plaintiff's criminal trial that he handcuffed Plaintiff behind her back. (Pl. Opp'n Br., Ex. B (Criminal Trial Transcript ("Trial Transcript")) 171:6-171:19, Doc. No. 42-2). Defendant Schaffer also disputes Plaintiff's assertion that he—or even Officer Doto—twisted Plaintiff's arm during the arrest. (Schaffer Dep. 71:23-72:2.) Again, these factual disputes are more properly left to the jury, as is any determination as to Defendant Schaffer and/or Plaintiff's credibility. Regardless, however, as discussed supra, Plaintiff has offered sufficient evidence to create a genuine issue of

Plaintiff testified that she subsequently saw Dr. Paulvin for numbness in the upper left portion of her back, between her spine and shoulder blade, and that he took x-rays of her back and hips.  (Middleton April Dep. 35:11-22; 36:5-13.)  Dr. Paulvin did not treat Plaintiff any further, and she has not seen another physician since her injury; however, she testified that her injury does return now and then, especially in humid weather.  (Id. 36:17-37:11.)

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant Schaffer used excessive force.  Indeed, although Defendants argue that Plaintiff did not claim any visible injury from the handcuffing, the mere absence of a "visible injury" does not defeat an excessive force claim.  Smith v. Mensinger, 293 F.3d 641, 648-49 (3d Cir. 2002) (noting that injuries are only one of several factors that a court must consider in answering whether force was applied in good faith and that "de minimis injuries do not necessarily establish de minimis force.").  Although Defendants also note that Plaintiff has not presented objective medical evidence, or sought further follow up care, she did testify that she continues to feel pain from her alleged injury and could certainly testify to that effect should there be a trial on this issue.

Based on the foregoing, the Court finds that there is sufficient evidence to create an issue of fact as to whether the force Defendant Schaffer used was reasonable.  The evidence indicates that Plaintiff was fully cooperating with Schaffer, informed him that he was hurting her in the course of her handcuffing and asked him to stop, Defendant Schaffer testified that he did not have to contend with any other individuals at the time of Plaintiff's arrest, (Schaffer Dep. 68:11-

---

material fact as to whether she was subjected to excessive force in violation of her Fourth Amendment rights.  It will be up to a jury to decide whether Defendant Schaffer should be held liable for that violation.

23), and the offenses at issue were relatively minor, non-violent charges.  As such, the Court

cannot conclude that it would have been unclear to a reasonable officer that his conduct was

unlawful under the circumstances of Plaintiff's arrest.  See Klemash v. Monroe Twp., No. 07-

4190, 2010 WL 455263, at *8 (D.N.J. Feb. 4, 2010) (noting that where defendant was told

repeatedly that plaintiff was unable to move his arm behind his back, and the offense was minor,

it was clear that a reasonable officer would have known his conduct was unlawful under the

circumstances).

Accordingly, Defendant Schaffer is not entitled to qualified immunity on Plaintiff's

excessive force claim, and Defendants' motion for summary judgment as to this claim will be

denied.[10]

### B.      Claims Against Defendant City of Ocean City

"Municipalities cannot be responsible for damages under [section] 1983 on a vicarious

liability theory, and can be held liable only if the municipality itself commits a constitutional

violation."  Badalamente v. Monmouth Cnty. Prosecutor's Office, No. 08-2501, 2011 WL

1898833, at *7 (D.N.J. May 17, 2011) (citing Carswell v. Borough of Homestead, 381 F.3d 235,

244 (3d Cir. 2004)).  "When a suit against a municipality is based on [section] 1983, the

municipality can only be liable when the alleged constitutional transgression implements or

executes a policy, regulation, or decision officially adopted by the governing body or informally

adopted by custom."  McTernan v. City of York, 564 F.3d 636, 657 (3d Cir. 2009); see also

Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978).  Policy is implemented

---

[10] "Qualified immunity may still be available at trial in light of the jury's findings of facts."  Klemash v. Monroe
Twp., No. 07-4190, 2010 WL 455263, at *8 n.3 (D.N.J. Feb. 4, 2010) (citing Halpin v. Gibson, No. 05-2088, 2009
WL 3271590, at *2-3 (D.N.J. Oct. 9, 2009) (considering a post-trial motion for qualified immunity))."

when a "decision maker possessing final authority to establish a municipal policy with respect to the action issues an official proclamation, policy, or edict."  Id. at 658.  Custom, on the other hand, is adopted when, though not authorized by law, "such practices . . . are so permanent and well-settled as to virtually constitute law."  Id.   "New Jersey courts apply the Monell standard to claims under both the federal constitution and the New Jersey constitution."  Badalamente, 2011 WL 1898833, at *7 (citing Besler v. Board of Educ. of West Windsor-Plainsboro Reg'l School Dist., 993 A.2d 805, 816-17 (N.J. 2010)); see also Bayer v. Twp. of Union, 997 A.2d 1118, 1136 (N.J. Super. Ct. App. Div. 2010) (addressing municipal liability only under the federal standard even though both federal and state constitutional claims were asserted)).

"When a [section] 1983 claim is predicated upon a municipality's failure to supervise, train or otherwise establish proper procedures to prevent the occurrences of constitutional violations by its employees, plaintiff must adduce evidence that a policy-maker 1) had notice that a constitutional violation was likely to occur, and 2) acted with deliberate indifference to the risk."  Id. (citing Hernandez v. Borough of Palisades Park Police Dep't, 58 F. App'x. 909, 912 (3d Cir. 2003); Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)).  "Generally, notice is established through a pattern of known prior violations.  Only in the rare instance that a constitutional violation is so 'known and obvious' or the 'highly predictable consequence' of an ongoing course of action is knowledge of past violations unnecessary."  Id. at *7-8 (internal citations omitted).

Plaintiff argues that she has sustained a claim for deliberate indifference against Defendant City based on its failure to adequately train its police officers on proper arrest procedures.  Specifically, she states that during the time Defendant Schaffer served with the

24

OCPD it did not require its officers to attend training on arrest procedures, and that this training was received only by way of attendance at the police academy.  (Pl.'s Opp'n Br. 26 (citing Schaffer Dep. 20:11-24).)  Further, the only guidance the OCPD provided to its officers on arrest procedures was providing them with the OCPD Operating Procedures and requiring them to sign an "Acknowledgement of Receipt Form."  (Id. at 26-27 (citing Ex. O (Documentation Form, General Order 05-23, Policy and Procedure for Arrest, Search, and Processing), Doc. No. 42-4.)

Plaintiff fails to make an adequate showing on this claim.  First, although Plaintiff sets forth cursory allegations in her Complaint concerning a policy or custom that caused the deprivation of her rights, she fails to submit supporting evidence that any policy, custom, regulation or decision officially or informally adopted by Defendant City directly contributed to any constitutional violations committed by Defendant Schaffer.  Plaintiff also fails to point any history of past violations concerning arrest procedures that would have put Defendant City on notice that future violations would likely to occur, nor does Plaintiff show that Defendant City acted with deliberate indifference to her constitutional rights.  See Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) ("Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations").

Accordingly, the Court finds that even when viewing the facts in light most favorable to Plaintiff, no reasonable jury could find that Plaintiff has established liability against Defendant City.  As such, the Court will grant Defendants' motion as to Plaintiff's claims against Defendant City.

### C.      PUNITIVE DAMAGES

Municipalities are immune from liability for punitive damages under section 1983.  <u>See</u>

<u>Klemash v. Monroe Twp.</u>, No. 07-4190, 2010 WL 455263, at *11 (D.N.J. Feb. 4, 2010) (citing

<u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981)).  It appears that Plaintiff

concedes this fact as she only argues for punitive damages as to Defendant Schaffer.

Accordingly, Plaintiff's claim for punitive damages against Defendant City, (<u>see</u> Compl. p. 8 ¶

A), are dismissed.

As to Defendant Schaffer, "[t]he purpose of punitive damages is to punish [a] defendant

for his willful or malicious conduct and to deter others from similar behavior."  <u>Memphis Cmty.</u>

<u>School Dist. v. Stachura</u>, 477 U.S. 299, 306 n.9 (1986).  "A jury may be permitted to assess

punitive damages in an action under [section] 1983 when the defendant's conduct is shown to be

motivated by evil motive or intent, or when it involves reckless or callous indifference to the

federally protected rights of others."  <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).

Here, Plaintiff testified that although she cooperated with Defendant Schaffer, he

continued to twist her arms and wrists in an effort to handcuff her during the course of her arrest.

Despite the fact that Plaintiff continued to plead for Defendant Schaffer to stop because she was

in pain, Defendant Schaffer ignored Plaintiff's request, told her that he could not stop because

she was under arrest, and proceeded in his efforts until the handcuffs were securely on Plaintiff's

wrists.  As of today, Plaintiff still has issues in her upper back.  <u>See</u> Part III.A.3 <u>supra</u>.

This evidence, if believed by the jury, could support a finding that Defendant Schaffer

was, at a minimum, callously indifferent to Plaintiff's Fourth Amendment rights.  <u>See</u> <u>Graham v.</u>

<u>Carini</u>, No. 09-4501, 2011 WL 1639998, at *6 (D.N.J. May 2, 2011)

Accordingly, Defendants' motion with regard to punitive damages as they relate to Plaintiff's excessive force claim against Defendant Schaffer will be denied.

## IV.    CONCLUSION

For the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' motion for summary judgment.  An appropriate order shall issue today.


Dated: 6/29/2014                                s/ Robert B. Kugler
                                                ROBERT B. KUGLER
                                                United States District Judge

27